1 STEPHANIE M. HINDS (CABN 154284)
Acting United States Attorney
2
3 HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division
4
5 SAILAJA M. PAIDIPATY (NYBN 5160007)
Assistant United States Attorney
6
   450 Golden Gate Avenue, Box 36055
7  San Francisco, California 94102-3495
   Telephone: (415) 436-7200
8  FAX: (415) 436-7234
   sailaja.paidipaty@usdoj.gov
9
10 Attorneys for United States of America

11                    UNITED STATES DISTRICT COURT

12                 NORTHERN DISTRICT OF CALIFORNIA

13                      SAN FRANCISCO DIVISION

14

15 UNITED STATES OF AMERICA,              )   **NO. 20-480-01 WHA**
                                          )
16             Plaintiff,                 )   **UNITED STATES' SENTENCING
                                          )   MEMORANDUM**
17      v.                                )
                                          )   Judge: Hon. William Alsup
18 Emilson Jonathan CRUZ Mayorquin,       )   Sentencing Date: December 14, 2021
        a/k/a "Playboy,                   )   Time: 2:00 p.m.
19                                        )
             Defendant.                   )
20 _____

21 **I.    INTRODUCTION**

22         On the streets of the Tenderloin, Defendant Emilson Jonathan Cruz Mayorquin went by the

23 nickname "Playboy."  He is a young man who found success by selling fentanyl, a drug that is

24 responsible for nearly two overdose deaths a day in San Francisco.[1]  And not only did he sell fentanyl,

25

26 _____
        [1] Jung, Yoohyun.  "San Francisco's Seizures of Deadly Fentanyl are Skyrocketing.  Is It
27 Impacting Supply?"  SF CHRONICLE. last updated May 28, 2021, available at
   https://www.sfchronicle.com/local/article/San-Francisco-s-seizures-of-deadly-fentanyl-are-
28 16208702.php (las accessed December 7, 2021).

                                              1
   UNITED STATES' SENTENCING MEMO.
   NO. 20-480-01 WHA

but he sold multiple varieties of fentanyl, referring to each type by a code name.  In doing so, he made money while preying on vulnerable individuals in this District and contributing to the epidemic that plays out on the streets of the Tenderloin daily.  And while fentanyl was the bread and butter of his business, Cruz Mayorquin sold a variety of other "products" – namely, heroin, methamphetamine, cocaine, and cocaine base.  His scope as a trafficker was broad; he sold to individual drug users on the street and he sold larger quantities to other resellers.  At the time of his arrest, federal agents seized nearly a kilogram of drugs from his apartment.

Cruz Mayorquin's conduct is the latest and most serious in a steady escalating pattern of criminal conduct.  Beginning as a juvenile, Cruz Mayorquin was arrested for crimes ranging from robbery to drug sales.  Those crimes may have otherwise been characterized as "youthful indiscretions," but for the continued and expanding nature of Cruz Mayorquin's conduct despite arrests, convictions, and two prior deportations.  Instead of walking away from drug dealing following a 2017 state conviction and subsequent deportation, Cruz Mayorquin returned to the United States and engaged in the widescale conspiracy before the Court now.  While he previously was a lower-level distributor, characterizing himself during a prior arrest as merely a "middleman," by 2020 he had graduated to a higher position in the trafficking ecosystem.  He had a reputation for being a leading local fentanyl distributor.  Along with other family members, his mother, sister, and uncle, Cruz Mayorquin distributed significant quantities of drugs.  Even amongst his family, he, along with this mother, had the steadiest streams of drug supply, which helped elevate his profile.

The government urges this Court to adopt the sentence recommended by the U.S. Probation Department of 51 months in custody, followed by four years of supervised release.  This recommendation incorporates a slight variance from the Guidelines range as calculated by the government for the reasons set forth below.  No further variance is warranted considering the seriousness of the conduct and Cruz Mayorquin's role in the drug trafficking conspiracy.

## II.    PROCEDURAL POSTURE

On December 8, 2020, the Honorable Laurel Beeler, U.S. Magistrate Judge, issued a criminal Complaint charging Cruz Mayorquin and five co-defendants with conspiring to traffic fentanyl in the

2

1  Bay Area.  Dkt. 1.  In conjunction with the Complaint, the Court issued warrants authorizing the arrest

2  of Cruz Mayorquin and his co-defendants.  *Id.*  Two days later on, December 10, 2020, federal agents

3  arrested Cruz Mayorquin, and six other individuals (the five co-defendants charged in the Complaint as

4  well as one other individual, Mayer Benegas Medina who was charged the same day in a separate

5  Complaint, *see* 20-mj-71816-MAG).  The following week, a federal grand jury returned an Indictment

6  charging Cruz Mayorquin and the six individuals arrested on the day of the takedown.  Dkt. 23. Cruz

7  Mayorquin was charged in Count One of the Indictment with participation in a conspiracy to traffic

8  fentanyl, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C), and in Count Eight of the Indictment with

9  Possession with Intent to Distribute 100 Grams or More of Heroin, in violation of 21 U.S.C. § 841(a)(1),

10  (b)(1)(B).  *Id.*

11       Following arraignment, the government moved to detain the defendant pretrial.  *See* Dkt. 10.

12  Following a contested hearing, Judge Beeler detained the defendant as a risk of flight.  *See* Dkts. 34. 59.

13  Subsequently, Cruz Mayorquin sought a renewed bond hearing during which the Court affirmed the

14  prior order of detention.  *See* Dkt. 74.

15       Cruz Mayorquin and his co-defendants appeared for an initial status before the District Court on

16  January 26, 2021.  Dkt. 68.  At the time, the parties explained that the underlying case involved an

17  extensive wiretap investigation and that there would be voluminous discovery produced by the

18  government, much of which would need to be translated for the defendants.  Following this initial

19  appearance, the parties continued apprising the Court of the status of the case through written updates in

20  lieu of physically appearing at a hearing due in large part to the logistical complexity at the time of

21  transporting defendants in a multi-defendant case from Santa Rita Jail.  The government recognizes that

22  in agreeing to keep the Court apprised in that fashion, the defendant waived his right to a physical

23  appearance while the attorneys continued to complete discovery and discuss the case.  This reduced

24  administrative burdens amidst the pandemic.

25       On September 21, 2021, Cruz Mayorquin entered a guilty plea to Count Eight of the Indictment

26  pursuant to a written agreement with the government.  *See* Dkts. 105, 106.

27  //

28  //

UNITED STATES' SENTENCING MEMO.
NO. 20-480-01 WHA

**III.**   **SENTENCING GUIDELINES CALCULATIONS**

   **A.**   **Offense Level**

   As set forth in the plea agreement, the parties agree that the following Sentencing Guidelines apply:

   a.   Base Offense Level, U.S.S.G. §§ 2D1.1(a)(5), (c)(6):                    28
        (At least 700 KG but less than 1,000 KG of Converted Drug Weight)

   b.   Acceptance of Responsibility (U.S.S.G. § 3E1.1(a):                    - 3

   The government recognizes that the U.S. Probation Office calculated a higher base level offense than the one agreed upon by the parties.  Presentence Report ("PSR") ¶ 25.  The government continues to recommend the calculation outlined in the plea agreement and makes its sentencing recommendation based on the resulting advisory Guidelines range.  *See generally United States v. Heredia*, 769 F.3d 1220, 1231 (9th Cir. 2014) ("[W]hen the prosecutor makes a promise to the defendant, that promise must be fulfilled") (internal citation and quotation marks omitted).

   Further, based on Cruz Mayorquin's criminal history, he is eligible for safety valve relief pursuant to the First Step Act.  He satisfies the other requirements under the safety valve statute, which allows this Court to sentence the defendant under the 60-month mandatory minimum, if appropriate.  At this time, the U.S. Sentencing Guidelines have not been amended to incorporate a two-level reduction for qualifying for the safety valve under the First Step Act.  Regardless, the government believes a two-level reduction is appropriate, which, based on the Guidelines as contemplated in the plea agreement, would reduce the offense level of 23. [2]

   **B.**         **Criminal History Category**

   The government agrees with the Criminal History Category (CHC) as calculated by Probation, which finds that Cruz Mayorquin falls within CHC III.  This calculation includes two-points for the commission of a crime while under a criminal justice sentence based on a five-year probationary term

---

   [2] The parties' written plea agreement also contemplated the possibility of a two-level downward departure for a group disposition if Cruz Mayorquin and five co-defendants pled guilty pursuant to plea agreements with the government.  Because the requirements of that group plea have not been met, the government is not moving for that departure.

UNITED STATES' SENTENCING MEMO.
NO. 20-480-01 WHA

arising from Cruz Mayorquin's 2017 conviction for California Health & Safety Code Section 11352(a) (Sale/Offer to Sell Controlled Substance). *See* PSR ¶ 39; *see also* U.S.S.G. § 4A1.1(d). Defense asserts that these two points should not be added following a change in state law that reduced the maximum term of probation applicable for defendant conviction of § 11352(a). Applying the new law, the Superior Court of Alameda County terminated the defendant's probation January 2021 because he had served the maximum term under the revised statute. Defense argues that by extension, had the defendant originally been sentenced under the new law, his term of probation would have run by the commencement of the current offense and the two points under § 4A1.1(d) do not apply. With respect to § 4A1.1(d), however, the Guidelines and Ninth Circuit law look not to whether a court later amended a sentence, but rather whether in real time – meaning at the actual moment in time when the defendant was committing the offense conduct – the defendant was subject to another criminal justice sentence.

### 1.    Cruz Mayorquin's Underlying Conviction and Change in Recent State Law

By way of background, as noted in the PSR, on June 1, 2017, BART police officers arrested Cruz Mayorquin on an outstanding warrant. PSR ¶ 37. At the time, Cruz Mayorquin possessed "three baggies of heroin, two baggies of methamphetamine, and 30 bindles of black tar heroin. Officers also later located a hatchet, a knife, and an identification card belonging to another person in his backpack." *Id*. He was charged with a violation of California Health & Safety Code Section 11352(a) (Sale/Offer to Sell Controlled Substance). *Id.* The following month on July 27, 2017, the Superior Court of Alameda County sentenced Cruz Mayorquin to five years' probation, with the first 180 days to be served in county jail. *Id.* Based on documents provided by defense counsel to the government, Cruz Mayorquin was in custody from the time of his arrest on June 1, 2017. Therefore, accounting for his custodial time, his five-year probationary term originally was scheduled to termination on or about June 1, 2022.

In September 2020, Governor Newsom signed into law California Assembly Bill 1950, which reduced the maximum probationary term for certain misdemeanors and felonies. Specifically, the bill reduced the maximum five-year probationary term for a violation of California Health & Safety Code Section 11352(a) to a two-year term. *See* Cal. Penal Code § 1203.1(a) (effective January 21, 2021). Since the passage of the bill, California state courts have held that the change applies retroactively such

UNITED STATES' SENTENCING MEMO.
NO. 20-480-01 WHA

1    that eligible defendants who have served longer than a two-year period can petition for early termination

2    of probation.  *People v. Sims,* 273 Cal. Rptr. 3d 792, 809 (Cal. Ct. App. 2021); *see also People v. Shulz,*

3    Cal.Rptr.3d 469, 474-75 (Cal. Ct. App. 2021).  Following passage of the bill, on January 29, 2021, the

4    Superior Court in Alameda terminated probation periods for defendants, including Cruz Mayorquin,

5    who had already served two years or more on probation.

### 2.    Legal Standard and Application of U.S.S.G. § 4A1.1(d)

7    In determining whether a defendant is under a criminal justice sentence at the time of committing

8    the current federal offense, the Guidelines and Ninth Circuit case law make clear that a sentencing court

9    must look to the facts as they existed at the time of the federal offense conduct.  While the government

10   has not located any Ninth Circuit case law interpreting the effects of Assembly Bill 1950 on criminal

11   history scores, several cases have reviewed the effect of later changes to a conviction and their effect on

12   CHC points under the Guidelines.  The framework set forth in *United States v. Alba-Flores*, 577 F.3d

13   1104, 1111 (9th Cir. 2009), is instructive.  In *Alba-Flores*, a defendant was on probation following a

14   misdemeanor conviction at the time that he committed his federal offense.  The addition of two criminal

15   history points under § 4A1.1(d) rendered the defendant ineligible for safety valve relief (the sentencing

16   in *Alba-Flores* occurred prior to the amendments to safety valve eligibility through the First Step Act;

17   defendants with more than one criminal history point were prohibited from safety valve relief).  In order

18   to lower his criminal history score, the defendant moved for and received a retroactive reduction in this

19   probationary sentence from the state court.  Alba-Flores argued that because the sentence was reduced,

20   he was not technically under a criminal justice sentence at the time that he committed his federal

21   offense.  In rejecting this position, the Ninth Circuit held that even if the state court altered the sentence,

22   "that does not affect the concrete fact that [the defendant] was 'under [a] criminal justice sentence' when

23   he committed his federal offense.  The later state court order could not change that concrete fact.  It is

24   the actual situation at that precise point in time, not the situation at some earlier or later point that

25   controls."  *Alba-Flores*, 577 F.3d 1104, 1111 (9th Cir. 2009).

26   In coming to this conclusion, the Court first reviewed the plain language of § 4A1.1(d), which

27   indicates that two points are added "if the defendant committed the instant offense while under any

28

6

1   criminal justice sentence." U.S.S.G. § 4A1.1(d). It went on to observe that the Guidelines provide two

2   specific limited occasions when a retroactive sentencing change results in the two-point enhancement no

3   longer applying. Specifically, convictions reversed or vacated due to errors in law or actual innocence

4   and convictions that are expunged are not counted towards Chapter Four enhancements, including

5   whether a defendant committed the offense while under another criminal justice sentence. *See* U.S.S.G.

6   § 4A1.2, Application Note 6; § 4A1.2(j); *Alba-Flores*, 577 F.3d at 1111. The Guidelines make clear,

7   though, that beyond these narrow exceptions, a prior sentence is counted even if the conviction is

8   vacated. *See* U.S.S.G. § 4A1.2, Application Note 10; *Alba-Flores*, 577 F.3d at 1111. The Court in

9   *Alba-Flores* concluded that because the defendant's case did not fit into a specific exception, the two

10   points applied.

11          The Court's approach is supported by the introductory commentary to Chapter Four of the

12   Sentencing Guidelines. There, the Sentencing Commission notes:

13                  A defendant with a record of prior criminal behavior is more culpable
                 than a first offender and thus deserving of greater punishment. General
14               deterrence of criminal conduct dictates that a clear message be sent to
                 society that repeated criminal behavior will aggravate the need for
15               punishment with each recurrence. To protect the public from further
                 crimes of the particular defendant, the likelihood of recidivism and future
16               criminal behavior must be considered. Repeated criminal behavior is an
                 indicator of a limited likelihood of successful rehabilitation.

17

18          A significant reason for calculating a criminal history score is to account for a defendant's past

19   recidivism and potential to recidivate in the future. The Commission makes clear that a repeat offender

20   should be subject to a "higher punishment with each recurrence." Logically, a defendant who is subject

21   to a criminal justice sentence yet remains undeterred and continues to commit crimes despite that

22   sentence should also be subject to a higher penalty. From this perspective, what matters is the

23   defendant's condition at the time that the offense conduct was committed or as the Ninth Circuit put it in

24   *Alba Flores*: "It is the actual situation at that precise point in time, not the situation at some earlier or

25   later point that controls." *Alba-Flores*, 577 F.3d 1104, 1111 (9th Cir. 2009).

26          Here, at the time that Cruz Mayorquin trafficked fentanyl and heroin as he admitted in his plea

27   agreement, he was actually under a term of probation in Alameda County. Cruz Mayorquin could not

28

UNITED STATES' SENTENCING MEMO.
NO. 20-480-01 WHA

1  have known that at some point in the future, the California Assembly would pass a law affecting the

2  length of his probationary term.  He continued to deal drugs and expanded the scope and dangerousness

3  of his drug dealing, despite being on a term of probation. The Court should therefore apply the two

4  points under § 4A1.1(d) and find a resulting Criminal History Category of III.

5      **C.**    **Advisory Guidelines Range**

6      At CHC III and a total offense level of 23, Cruz Mayorquin's advisory Guidelines range is 57-71

7  months.

8  **IV.**    **GOVERNMENT'S SENTENCING RECOMMENDATION**

9      The Court should impose a sentence sufficient, but not greater than necessary, to reflect the

10  purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2).  *United States v. Carty*, 520

11  F.3d 984, 991 (9th Cir. 2008).  The Court should begin by calculating the correct sentencing range under

12  the Sentencing Guidelines.  *Id.*  The Guidelines are the "'starting point and the initial benchmark,'"

13  *United States v. Ellis*, 641 F.3d 411, 415 (9th Cir. 2011) (quoting *United States v. Kimbrough*, 552 U.S.

14  85, 108 (2007)), and the Court should "remain cognizant of them throughout the sentencing process."

15  *United States v. Gall*, 552 U.S. 38, 50 n.6 (2007).  After determining the appropriate Guidelines

16  calculations, the Court should then evaluate the sentence for substantive reasonableness in light of the

17  factors set out in Section 3553(a).  *Carty*, 520 F.3d at 991-93.  Here, the most important considerations

18  are the nature and circumstances of the offense, the history and characteristics of the defendant, the need

19  to afford adequate deterrence, and the protection of the public.  18 U.S.C. § 3553(a)(1), (a)(2)(B).

20      **A.**    **Cruz Mayorquin sold large quantities of fentanyl and profited handsomely.**

21      As noted in the PSR, Cruz Mayorquin and his family sold multiple types of drugs – fentanyl,

22  heroin, and methamphetamine.  (PSR ¶¶ 10-14.)  But their primary product was fentanyl.  (PSR ¶ 10.)

23  Cruz Mayorquin or "Playboy," his nickname on the streets, was known as the person to go to buy

24  fentanyl.  (PSR ¶ 19.)  And there is no question that Cruz Mayorquin was motivated by money.

25      In many traditional drug trafficking networks, mid-level suppliers, meaning suppliers who can

26  provide redistribution quantities to other drug dealers, tend to stay away from street-level drug sales

27  where dealers typically sell smaller amounts to drug users.  Working on the streets exposes a dealer to

28

UNITED STATES' SENTENCING MEMO.
NO. 20-480-01 WHA

1    the constant potential for arrest.  Cruz Mayorquin's long criminal history, dating back to when he was a

2    juvenile and continuing until his conviction in 2017, illustrates this best.  He was repeatedly arrested for

3    street-level sales both in California and in Utah.  *See* PSR ¶ 37, 41-42.

4            Over time Cruz Mayorquin established himself further and was able to source larger quantities of

5    drugs.  For example, at the time of his arrest, agents seized nearly half a kilogram of heroin and a half a

6    kilogram of fentanyl from his apartment.  Cruz Mayorquin admits that he was able to sell ounce and half

7    kilogram quantities to customers.  Dkt. 106, Plea Agreement ¶ 2.  But despite becoming a mid-level

8    dealer, Cruz Mayorquin continued to sell smaller amounts of drugs on the streets of the Tenderloin and

9    intercepted calls show why – it was profitable and led to more business.  As Cruz Mayorqun admits in

10   the plea agreement, on October 29, 2020, he sold two ounces of fentanyl to a customer for $1,600.  Dkt.

11   106, Plea Agreement ¶ 2.  During the call, he used coded language referring to various colors that stood

12   for different varieties of fentanyl.  *Id.*  Later that day, at approximately 2:20 p.m., agents intercepted a

13   call from Cruz Mayorquin to an unknown male who was using a phone number ending in -9393 (UM-

14   9393).  Dkt. 23, Compl. ¶ 47l.  During the call, Cruz Mayorquin said he had just done a "two ounce deal

15   with a new dude."  *Id.*  He went on to say that "the gram customers recommended other good customers

16   who got more."  *Id.*  As described in the Complaint, agents believe the defendant was commenting on

17   how a customer who bought user quantities of drugs – "the gram customers" – referred other customers

18   to Cruz Mayorquin who purchased larger quantities – "other good customers who got more."  In

19   essence, the drug addicts on the streets of the Tenderloin became a referral service for larger sales.  The

20   streets surrounding the federal courthouse are replete with agonizing scenes of addiction and suffering,

21   and Cruz Mayorquin used these individuals to increase his bottom-line.

22           The evidence of Cruz Mayorquin's material success is also illustrated in intercepted calls.  For

23   example, during a call intercepted over the defendant's mother's phone line (Leydis Yaneth Cruz),

24   Leydis[3] spoke with a family member abroad about a house that Cruz Mayorquin was constructing in

25   Honduras.  A translated excerpt of the conversation follows:

26

27           [3] Because several defendants in this case have the same or similar last names, the government

28   will refer to certain individuals by their first names to avoid confusion.

9

UNITED STATES' SENTENCING MEMO.
NO. 20-480-01 WHA

| | | |
|---|---|---|
| 1 | LEYDIS | Emilson is also stressed here with work so then he gets stressed with…[audio |
| 2 | | glitch]… he stresses her, and they are just like that, just problems, so then… |
| 3 | | mainly where it could me more relaxed is in Honduras. Life here is a little |
| 4 | | stressed because… thing is that Emilson has a lot of customers and one calls him, |
| 5 | | another one calls him, how can there be no stress. |
| 6 | RELATIVE | Yes, because there are times when he's talking with… [Aside: wait mami, we can |
| 7 | | talk later]…Look, he's removing the ceramic from the house, he's going to put |
| 8 | | porcelain. [U/I] how can I say no to him. |
| 9 | LEYDIS | [U/I] |
| 10 | RELATIVE | Let's give him the satisfaction. That house is not going to look like a house, it's |
| 11 | | going to look like a mansion. With everything that he's asking. |
| 12 | LEYDIS | My God, thing is that Emilson doesn't stop spending, right? |
| 13 | | […] |
| 14 | RELATIVE | I told everyone, [U/I] a garage in his house. He said, here in the name of [U/I]. |
| 15 | | This guy wants to leave it like a, like what can I tell you… Look, with everything |
| 16 | | that that man has asked for [U/I] that house is not going to look like a house. |
| 17 | LEYDIS | God permit. |
| 18 | RELATIVE | A mansion. |
| 19 | LEYDIS | So then it's a mansion and a half, what he's making [U/I]. |
| 20 | RELATIVE | You could see what, how it will be, because everything white. White on top and |
| 21 | | white on the bottom. He's going to throw out all the wood. |
| 22 | LEYDIS | Emilson [U/I]. Just anyone is going to go live there and they will use it first. |

23      Based on the context of the call, Leydis and the family member appear to be discussing a house

24 under construction that Cruz Mayorquin was funding, presumably through his drug proceeds.  Leydis

25 decried the amount of money that he was spending.  The family member responded that with the amount

26 of things Cruz Mayorquin was planning on doing, the final product won't be a "house," but will be a

27 "mansion."

28

UNITED STATES' SENTENCING MEMO.
NO. 20-480-01 WHA

Following the defendant's arrest, agents located photographs of what is believed to be the home Cruz Mayorquin was building – a home funded by profits from drug trafficking and that the defendant will still be able to return to after the completion of his sentence.  Below are a few photographs that were previously produced by the government during the discovery process:

UNITED STATES' SENTENCING MEMO.
NO. 20-480-01 WHA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



UNITED STAT
NO. 20-480-01 WHA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





13

1

2

3      ██████      He was no small-time drug dealer, but rather made a significant amount of money.  Cruz

4   Mayorquin may be a young man, but he learned quickly how to succeed in the drug game.

5         **B.    Cruz Mayorquin's drug trafficking continued despite his prior arrests, convictions,
              and removals from the United States.**

6

7         As outlined in the PSR, this is not Cruz Mayorquin's first run in with the law nor his first time

8   being arrested for drug dealing.  He was arrested twice as a juvenile in San Francisco in connection with

9   drugs sales.  PSR ¶¶ 41-42.  After being placed in the custody of his mother, who was then living in

10  Houston, he violated his immigration bond and was deported.  PSR ¶ 53.  Up until this point, Cruz

11  Mayorquin's conduct may be considered as the actions of a teenager who did not know any better and

12  had little meaningful guidance.  His criminal activity, however, did not end here.

13        When he illegally returned to the United States, Cruz Mayorquin initially tried his hand at drug

14  dealing in another state and was ultimately arrested in Salt Lake City.  PSR ¶ 43.  Just two weeks after

15  his arrest, Cruz Mayorquin failed to appear for court.  *Id.*  Likely fleeing to avoid the consequences in

16  Utah, Cruz Mayorquin returned to the Bay Area where he was arrested on January 19, 2017, and then

17  again on June 1, 2017, both in connection with drug sales.  PSR ¶ 37, 47.  It was this second 2017 arrest

18  that led to Cruz Mayorquin's only criminal conviction.  PSR ¶ 37.  The PSR describes the circumstances

19  of Cruz Mayorquin's drug dealing during this period.  *See* PSR ¶ 37, 43.  Following both arrests, Cruz

20  Mayorquin reported that he was working for other individuals and that he was merely a "middleman."

21  *Id.*  After being sentenced in July 2017, Cruz Mayorquin was deported again and returned to Honduras.

22  *Id.*  Once more, despite the opportunity to stop selling drugs in this District, Cruz Mayorquin returned to

23  the Bay Area.  This time, Cruz Mayorquin went from being a middleman to running a drug operation in

24  conjunction with his family.

25        The government concedes that Cruz Mayorquin does not fit the definition of a "leader,"

26  "organizer," or "manager" as those terms are defined by the U.S. Sentencing Guidelines.  However,

27  intercepted calls indicate that Cruz Mayorquin, along with his mother, led the family business in a more

28

UNITED STATES' SENTENCING MEMO.
NO. 20-480-01 WHA

colloquial sense.  PSR ¶ 19.  Other co-conspirators often turned to them for drug supplies and for updates on when additional drugs would be procured.

Cruz Mayorquin could have called it quits after his 2017 conviction and deportation.  But he chose to come back and in doing grew his stature as a drug dealer and expanded his operation.  Even if his prior arrests and removals could be viewed against the lens of his youth, at some point, and certainly by the time of the federal offense conduct, Cruz Mayorquin knew what he was doing, profited from what he was doing, and was old enough and experienced enough in the drug trade to understand the gravity of what he was doing.  He should therefore be held accountable for that conduct.

### C.     The quantity of fentanyl sold in this case require a significant penalty.

As the Court well knows, and as more and more people are discovering in this District, fentanyl is one of the most lethal substances to hit the streets.  Preliminary data reported by the San Francisco Office of the Medical Examiner indicates that between January and August 2021, approximately 457 individuals in the city died of accidental drug overdoses.  Of those, the vast majority, 328 people (71.7%), died from fentanyl ingestion.[4]  According to the DEA, two milligrams of fentanyl can be a fatal dose.[5]  The half kilogram of fentanyl seized from Cruz Mayorquin's apartment alone could kill 250,000 people.  Individuals selling this quantity of fentanyl should face more severe consequences based on the nature of the drug and the volume sold.

[redacted]

---

[4] Rodda, Luke.  Office of the Chief Medical Examiner.  Report on Accidental Overdose Deaths. September 28, 2021, available at https://sf.gov/sites/default/files/2021-09/2021%2009_OCME%20Overdose%20Report.pdf (last accessed October 2, 2021).

[5] U.S. Drug Enforcement Administration.  Facts About Fentanyl, https://www.dea.gov/resources/facts-about-fentanyl (last accessed October 2, 2021).

UNITED STATES' SENTENCING MEMO.
NO. 20-480-01 WHA

UNITED STATES' SENTENCING MEMO.
NO. 20-480-01 WHA



\* \* \*

Overall, Cruz Mayorquin was at the top of an organization that sold large amounts of fentanyl and other drugs.  The scope of the operation coupled with Cruz Mayorquin's escalating conduct despite prior arrested and deportations require a significant custodial sentence.

UNITED STATES' SENTENCING MEMO.
NO. 20-480-01 WHA

## V.     CONCLUSION

The government respectfully recommends that this Court impose a 51-month custodial sentence, followed by four years of supervised release, and a $100 mandatory special assessment.

DATED:  December 8, 2021                                    Respectfully submitted,

STEPHANIE M. HINDS
Acting United States Attorney

_____/s_____
SAILAJA M. PAIDIPATY
Assistant United States Attorney

UNITED STATES' SENTENCING MEMO.
NO. 20-480-01 WHA